**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAVID J. ELKINS,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL AVIATION ADMINISTRATION,<br><br>Defendant. | Civil Action No. 14-476 (JEB) |

**MEMORANDUM OPINION**

On July 19, 2013, *pro se* Plaintiff David Elkins spotted an aircraft overhead that appeared to circle his residence near St. Petersburg, Florida, and then follow him for some time thereafter. Concerned that he was the subject of government surveillance, he submitted a Freedom of Information Act request to the Federal Aviation Administration seeking records relating to the suspicious aircraft. The FAA, in response, conducted a search and released to him voice transmissions that it had partially redacted under FOIA Exemption 7(E). After Elkins challenged such response by filing this suit, the Court denied the FAA's summary-judgment motion, concluding that the agency had neither adequately justified its search nor sufficiently defended its withholdings. The FAA has since supplemented its search, released one more record to Elkins, and identified several others, which it has withheld in full. Having done so, it now renews its Motion for Summary Judgment. Because Defendant has not yet fully explained pieces of its search, and because it has justified its withholdings as to only one record, the Court will grant the Motion in part and deny it in part.

**I.    Background**

As the Court noted in its previous Opinion, Elkins has some history with the FAA. See Elkins v. Fed. Aviation Admin. (Elkins I), No. 14-476, 2014 WL 4243152, at *1 (D.D.C. Aug. 28, 2014). Since 2005, he has submitted several requests to the agency seeking records pertaining to aircraft he has observed flying overhead. See Compl. at 2-6. His stated purpose in seeking these records is to expose and document unlawful government surveillance, id. at 3, and his FOIA requests have met with varying levels of success. See Elkins I, 2014 WL 4243152, at *1 (collecting cases).

Elkins originally submitted the FOIA request in contention here on July 19, 2013. See Mot., Exh. A. His request was prompted by his observation of an aircraft that circled over his house near St. Petersburg and then proceeded to follow him as he traveled away from home. See Compl. at 5. He asked the FAA to provide the following records:

> The N number [the number by which aircraft are registered with the FAA], [t]he law enforcement agency op[]erating the aircraft, the inflight radio communications between Tampa ATC or Saint Petersburg/Clearwater and this aircraft, pre filed flight plan allowing it to fly in this area, all records of court authority (warrant) showing cause to FAA to conduct surv[e]illance, all records of Department of Justice or Pinallas County sheriff participation, all records of who has tactical of this aircraft. All records of [Department of Justice] agreement with FAA to withhold a determination of release of these requested records, all records of non-privile[]ge[d] communications between DOJ and FAA Tracon Tampa, College Park FAA.

July 19, 2013, Request. Elkins amended this request a couple days later to add:

1. All records of agreement between the entity operating this aircraft and the FAA allowing [it] to either not turn on it[]s transponder or the FAA agreeing not to track the plane.
2. All records of radio contact between the commercial jet and Tampa ATC warning the jet of aircraft in the vicinity (in-flight radio communications)

2

      3. All records of agreement between "passurslive" [Passur is a private flight-monitoring company] and the FAA to allow interruption of live feeds (end taps) to their public web site if any.
      4. All records if any, presented to the FAA by this entity showing that they have cause of action (warrant) to pursue this surveillance
      5. All records how long actually the plane was in flight
      6. All records from w[h]ere it departed, and w[h]ere it landed . . .
      7. ALL RECORDS OF WHAT ENTITY HAD TACTICAL CONTROL OVER THIS AIRCRAFT.

Mot., Exh. B (July 23, 2013, Request).

      In response, the FAA notified Plaintiff that it had searched for records "at Tampa Airport Traffic Control Tower," and that it was releasing to him a "compact disc containing voice []recordings pertaining to [his] request," from which the "Aircraft Registration Number" had been redacted. See Compl., Exh. 1 (November 5, 2013, Response). Dissatisfied with this response, Elkins filed suit in this Court. Defendant then filed a Motion for Summary Judgment, claiming that it had (1) conducted an adequate search and (2) properly withheld identifying information from the voice recording pursuant to Exemption 7(E). See ECF No. 13.

      The Court denied the Motion on both issues. First, it found that the FAA's explanation of the search left it with "distinct uncertainty as to whether the agency appreciated the whole of Plaintiff's FOIA request." Elkins I, 2014 WL 4243152, at *4. Specifically, the FAA appeared to understand "Plaintiff's request as limited in scope to records likely to be housed at an airport traffic-control tower." Id. Yet some of the records Elkins requested – e.g., "DOJ agreement[s] with FAA" – were "likely to be housed elsewhere." Id. The Court, accordingly, advised the FAA to "make clear in any future declaration that the Tampa Airport Traffic Control Tower is the only location that might house records responsive to each one of Plaintiff's enumerated requests." Id.

Second, the Court concluded, the FAA had failed to adequately explain its withholdings. On this front, the agency's "briefing [was] replete with vague and conflicting references to redacted material." Id. at *5. For instance, the FAA at times noted that only the airplane's "'N' number [had been] redacted," while at other times it alluded to "broader redactions," including the plane's "call sign." Id. "Before renewing its Motion," the Court advised, the agency should "provide[] a full explanation of its withholdings for any records and redacted portions not made available to [Plaintiff]." Id. at *6.

Heeding these admonitions, the FAA broadened its search, which in turn uncovered several additional responsive records. It then contacted Plaintiff in a letter dated October 8, 2014, summarizing its findings and itemizing its responses to his request by category. See Mot., Exh. D. The agency explained that it was still withholding records that included the identifying information of the law-enforcement agency operating the aircraft, records regarding who had tactical control of the aircraft, and records detailing the plane's flight path. Id. at 1-3. The FAA did, however, release to Elkins its vendor agreement and current renewal with Passurs. Id. at 4-17. In a follow-up letter, dated October 20, 2014, the agency advised Elkins that it was withholding in full records relating to participation by DOJ or the Pinallas County Sheriff. See Mot., Exh. E.

Having supplemented its search and reasserted its withholdings, the FAA now renews its Motion for Summary Judgment.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). In FOIA cases, the agency bears the ultimate burden of proof. See Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 n.3 (1989). The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

### III.  Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146,

152 (1989) (citation omitted).  The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . .  shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds.  See 5 U.S.C. § 552(a)(4)(B); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989).

"Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  Reporters Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)).  "At all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure' . . . ."  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

The FAA argues that summary judgment is proper because it has now conducted an adequate search for responsive records and any not released were properly withheld under Exemption 7(E).  The Court, unfortunately, cannot fully agree with either contention.

   A.   Adequacy of the Search

 "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  Valencia-Lucena v. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)); see also Steinberg v. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994).  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was

6

adequate." Weisberg v. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984). The adequacy of an agency's search for documents requested under FOIA "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." Id. To meet its burden, the agency may submit affidavits or declarations that explain the scope and method of its search "in reasonable detail." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982). Absent contrary evidence, such affidavits or declarations are sufficient to show that an agency complied with FOIA. See id. On the other hand, if the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." Truitt, 897 F.2d at 542.

As noted above, the FAA in earlier briefing appeared to construe Elkins's request as limited to records likely housed at an airport traffic-control tower, even though it "also itemized records likely to be housed elsewhere." Elkins I, 2014 WL 4243152, at *4. The Court, accordingly, advised the agency "to submit new documentation to Elkins that demonstrates the adequacy of its search for each requested record . . . ." Id. at *6 (emphasis added). The FAA took this advice to heart.

To see if any additional responsive records existed, Carol Might, Special Operations Liaison for the FAA, broadened the agency's search. See Mot., Exh. C (Declaration of Carol Might), ¶ 6. In her declaration, she explains the actions she took regarding each individual category of records Elkins requested in both letters, an approach that greatly clarifies the situation at hand. The Court begins by mentioning the requests that did not yield responsive documents and then discusses those that did.

Might learned, for instance, from the agency that operated the plane that, per policy, there was no pre-flight plan for the craft. Id., ¶ 7(D). As to Elkins's request for authorizations to

conduct surveillance, she explains that the National Airspace System is open, and aircraft like the one in question do not need warrants to fly within it. Id., ¶¶ 7(E), 7(4). Were any mission records to exist, she continues, they would be found in the Office of Security and Hazardous Materials Safety or the AJR-2 at FAA Headquarters. Id. A search turned up no records in either place. Id. Might also relates that it is FAA policy not to memorialize agreements with law-enforcement agencies regarding release of records, and, accordingly, no such records exist in this case. Id., ¶ 7(H). She further notes that there were no "non-privileged communications" between DOJ and FAA Tracon or FAA Regional Office at College Park, Georgia. Id., ¶ 7(I). Nor, for reasons that will be made clear below, were there any authorizations for the aircraft to fly without its transponder on. Id., ¶ 7(1). And aside from the voice recordings already released to Elkins, there were no other records of radio contact found at Tampa Air Traffic Control – the only location such records would be located. Id., ¶¶ 7(C), 7(2). Finally, although the FAA originally claimed to be redacting the craft's N number from the audio recordings, as a law-enforcement plane, it actually identified itself with a call sign. Id., ¶ 7(A). The FAA, as a result, does not know the craft's "N number." Id.

On the other hand, some of Elkins's requests did obtain results in the FAA's broadened search. Records of the participation of DOJ or the Pinallas County Sheriff, Might reveals, would be found at Tampa Approach, AHE-320 or AJR-2. Id., ¶ 7(F). Although she located no such records there, she did uncover a document that she thought could be construed as evidence of the "participation" of a government agency. Id. Specifically, coordinating with the ATO System Operations Services Data Management office to search the National Offload Program, Might uncovered a flight track of the subject aircraft – a record the FAA has withheld at the request of the law-enforcement agency operating the plane. Id., ¶ 7(5). As to what entity had tactical

control of the aircraft, Might found an FAA Order for Law Enforcement Operations, which contains "the identity" of the law-enforcement agency that operated the craft – a document the FAA also withheld in full.  Id., ¶ 7(G).  Finally, with the help of Dean Torgensen, FOIA Group Manager in the FAA's ATO Litigation Support Group, Might was able to locate the FAA's agreement with Passur – which was released to Elkins.  Id., ¶ 7(3).

While Might's declaration is commendable in its attention to each category of requested records, it proves wanting, as Plaintiff points out, as to three of them.  Elkins disbelieves, for instance, the representation that there were no communications between DOJ and Tampa TRACON or between DOJ and the FAA located in College Park.  See Opp. at 15.  As to this category of his request, Might states summarily that were no responsive records.  See Might Decl., ¶ 7(I).  She does not, however, describe the place such a record would be stored if it did exist, what she did to search that location, or any detail regarding how she came to conclude that no responsive records exist.  See Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990) ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.").  Similarly, as to records of the participation of DOJ or the Pinallas County Sheriff, Might does note where they would be found – Tampa Approach, AHE-320 or AJR-2 – but not what search she conducted there.  See Might Decl., ¶ 7(F).  Without any further information on the search regarding these categories, the Court cannot conclude that it "was reasonably calculated to uncover all relevant documents."  Valencia-Lucena, 180 F.3d at 325 (internal quotation marks omitted).

Plaintiff, moreover, has provided evidence that in other FOIA cases, the agency has released to him agreements between itself and law-enforcement agencies to withhold records. See Opp. at 4-5. Yet Might again does not describe any action she took as to this category, relating only that it is not the FAA's policy to create such documents. If responsive records can exist, however, then presumably there is a place Might could search to find them – a search she must describe.

Finally, Plaintiff contends that the FAA does, in fact, "know" the N number of this particular aircraft or at least could derive it from other identifying information. See id. at 10-11. According to Elkins, the aircraft would have transmitted an eight-digit "Mode S code," which, through a proprietary algorithm, the FAA could translate into an N number. Id. This assertion does not, however, undermine the adequacy of the FAA's search. Even if the FAA did have the resources to determine the plane's N number, "FOIA imposes no duty on the agency to create records." Forsham v. Harris, 445 U.S. 169, 186 (1980) (emphasis added). And since the agency's search did not uncover records related to the N number, its obligation ended there.

In the end – although more detailed than those provided in the first round of briefing – the FAA's declarations still fail to explain what search it undertook to locate: (1) non-privileged communications between DOJ and FAA Tracon or DOJ and FAA Regional Office at College Park; (2) records of DOJ's or the Pinallas County Sheriff's participation; and (3) any agreement with law enforcement regarding the withholding of records. The Court will, therefore, deny summary judgment on the search issue.

### B. The FAA's Withholdings

Plaintiff also challenges the FAA's withholdings. By way of review, the agency's aggregate search produced the following four records:

- The FAA's original and renewal agreement with Passur, both of which it released in full;

- Radio communications between the airplane and control tower – which the FAA released after redacting the identifying information or "call sign" of the craft;

- Flight-tracking records, which the FAA withheld in full; and

- An FAA Order for Law Enforcement Operations, which contains the identity of the law-enforcement agency that operated the craft, also withheld in full.

In its communications with Elkins and in the declarations submitted with its Motion, the FAA invoked two exemptions in withholding these records: 7(A) and 7(E). In briefing, however, it appears to have abandoned any reliance on 7(A) and bases its withholdings on 7(E) alone.

This exemption covers "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). In the present case, it is the first requirement – the purpose for which the records were compiled – that proves a stumbling block for the FAA on the majority of its withholdings.

In considering this requirement, the D.C. Circuit recently made clear that it is not the nature of the agency that controls, but the character of the records withheld. In Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico, 740 F.3d 195 (D.C. Cir. 2014), the court stated, "Under the text of Exemption 7, the withheld record must have been compiled for law enforcement purposes; the withholding agency need not have

statutory law enforcement <u>functions</u>." <u>Id.</u> at 203-04 (citing 5 U.S.C. § 552(b)(7)) (emphasis in original). The agency's law-enforcement capacity, however, is not immaterial. "If the agency's principal function is law enforcement," the Court is "'more deferential' to the agency's claimed purpose for the particular records." <u>Id.</u> at 203 (quoting <u>Tax Analysis v. IRS</u>, 294 F.3d 71, 77 (D.C. Cir. 2002)). "If," on the other hand, "the agency has mixed law enforcement and administrative functions, [the Court] will scrutinize with some skepticism the particular purpose claimed." <u>Id.</u> (quotation marks omitted). Because the FAA's principal function is not law enforcement, therefore, the Court will kick the tires of its claimed exemptions with a bit more force.

      The FAA maintains that all three of its withholdings – the redacted call sign in the voice recordings, the flight-tracking records, and the FAA Order – were compiled for law-enforcement purposes. Its briefing on the issue, however, is laconic to say the least. As to the first, for instance, the agency does not clearly single out the voice recordings in discussing its purposes for creating the disputed records. The closest it comes is to note that "records pertaining to who had tactical control of the aircraft" were "filed for a law enforcement purpose." Mot. at 7. Even assuming this blanket description covers the call sign redacted from the voice recordings, this "explanation" is nothing more than a restatement of the standards governing the withholding of the information. It provides no information as to <u>what</u> law-enforcement purpose the voice recordings were created for, which is the key question in the first requirement of Exemption 7. And, as Plaintiff points out, identifying information such as call signs is transmitted to the FAA as a matter of course when flying in regulated airspace. These types of records are "produced . . . twenty four hours a day, seven days a week . . . for regulatory purposes." Opp. at 5. The voice communications, moreover, are apparently broadcast on open airwaves by all airplane operators.

The fact that this craft happened to be controlled by a law-enforcement agency does not somehow transform the FAA's purpose in recording its voice transmissions. See Benavides v. Bureau of Prisons, 774 F. Supp. 2d 141, 146 (D.D.C. 2011) (records of inmate telephone calls not compiled for law-enforcement purposes by Bureau of Prisons where they were routinely collected and agency's only justification for withholding them was its overall "mission" of law enforcement).

Similarly, as to the flight-tracking records, the FAA relates summarily that, although "the flight was tracked because it had the transponder on throughout the flight, the tracking records are being withheld as it was [*sic*] compiled for a law enforcement purpose." Mot. at 7. Again, the aircraft was tracked because it was an aircraft. And the FAA's purpose in creating such records appears to be general to all planes within its airspace (or at least Defendant has given the Court no reason to believe otherwise).

Contrast these records with those that the D.C. Circuit found properly withheld in PEER. The plaintiff there sought portions of action plans that "contain guidelines outlining the steps that law enforcement and emergency personnel should take in response to a failure of [certain] dams." The D.C. Circuit concluded that they "plainly were created" for law-enforcement purposes:

> [T]hey describe the security precautions that law enforcement personnel should implement around the dams during emergency conditions. . . . [I]t is also apparent that the inundation maps serve security purposes – namely, to assist law enforcement personnel in maintaining order and security during emergency conditions, and to help prevent attacks on dams from occurring in the first place. . . . In this context, preventing dam attacks and maintaining order and ensuring dam security during dam emergencies qualify as valid law enforcement purposes under the statute. . . . Because the emergency action plans and the inundation maps were created in order to help achieve those purposes, among others, they were compiled for law enforcement purposes.

13

Id. at 204 (emphasis added). Unlike the material withheld in PEER, these flight records contain no information intended to assist law-enforcement personnel in maintaining "order and security." There is no indication, furthermore, that they were created to help achieve any law-enforcement purpose.

Of course, the term "compiled for law enforcement purposes" does not limit Exemption 7 to records that were "originally compiled" or created for that reason. John Doe Agency v. John Doe Corp., 493 U.S. 146, 154 (1989). An agency can also establish that such records were later gathered or used for "law enforcement purposes at some time before the agency invokes the exemption," PEER, 740 F.3d at 203, even if the information was "generated on an earlier occasion and for a different purpose." John Doe, 493 U.S. at 154. In this case, however, the FAA has provided no basis upon which to conclude that these specific records – i.e., the voice recordings and flight-tracking records – although originally created for non-law-enforcement purposes, were ever subsequently compiled to enforce the law.

What remains then is the FAA Order for Law Enforcement Operations, which, the agency notes, contains "the identity" of the law-enforcement agency that operated the craft. In briefing, the FAA's justification for withholding this record is as summary as its explanation of the others. See Mot. at 7 (withheld because "the record was filed for a law enforcement purpose"). Were this all the FAA had provided, the Order would be subject to disclosure just like the flight data and voice identification. The FAA, however, supplemented its briefing with sealed declarations that – although the Court cannot discuss the details of the justifications they contain – reassure it that the Order does, in fact, satisfy the requirements of 7(E). The Order was indisputably created for law-enforcement purposes; its production would disclose techniques and procedures for law-enforcement activities; and disclosure would risk circumvention of the law.

14

See 5 U.S.C. § 552(b)(7)(E).  The Court is satisfied, moreover, that no releasable material could be segregated from the Order.

The Court concludes, accordingly, that as to the voice recordings and the flight-tracking information, the FAA has not met its burden of establishing that these records were compiled for law-enforcement purposes.  It has, however, properly justified its withholding of the FAA Order identifying the agency that had tactical control over the plane.

## IV.     Conclusion

For the foregoing reasons, the Court will grant the FAA's Motion for Summary Judgment in part and deny it in part.  An Order accompanies this Memorandum Opinion.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  April 16, 2015